# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH GUERRIERO and TONY SIKAVI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AUTHENTIC BRANDS GROUP, LLC, a Delaware limited liability company, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiffs Kenneth Guerriero ("Plaintiff Guerriero") and Tony Sikavi ("Plaintiff Sikavi") (collectively, "Plaintiffs") bring this action**,** on behalf of themselves and all others similarly situated**,** against Defendant Authentic Brands Group, LLC ("Brooks Brothers Factory" or "Defendant") and state:

## I.    NATURE OF ACTION

1.    "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Brooks Brothers Factory's fashion merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

2.      Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.      At all relevant times, Defendant has continually advertised false price discounts for merchandise sold throughout its Brooks Brothers Factory outlet stores. In bringing this putative class action complaint, Plaintiffs seek to remedy this deception and its attendant harm to consumers. Plaintiffs seek monetary damages, restitution, and declaratory and injunctive relief from Defendant arising from its false discounting scheme on apparel, accessories, shoes, and other items sold in its Brooks Brothers Factory outlet stores.

4.      False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (1992) [hereinafter Grewal & Compeau, *Comparative Price Advertising*] ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. Retailing 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

price and in turn the perceived value consumers ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.      The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00 believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.      The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false referencing pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand for the DVD through the reasonable, but incorrect, **perceived value** of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased

---

[2] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.2, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

willingness to pay $10.00 for the DVD. Thus  the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

7.     Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, New York and federal law. Specifically, Defendant violated and continues to violate: New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.* (the "NYDAPA"); New York False Advertising Act, N.Y. Gen. Bus. Law § 350, *et seq.* (the "NYFAA"); California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (the "CLRA"); and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.     Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who have purchased one or more of Defendant's factory outlet items advertised at a purported discount from a fictitious higher reference price from Brooks Brothers Factory outlet stores. Plaintiffs intend to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiffs also seek to permanently enjoin Defendant from engaging in this unlawful conduct. Further, Plaintiffs seek to obtain all applicable damages, including actual, compensatory, benefit of the bargain, statutory, and punitive; equitable restitution; reasonable costs and attorneys' fees; and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

## II.    JURISDICTION AND VENUE

9.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed Classes (defined below) have a different state citizenship from Defendant.

10.    The Southern District of New York has personal jurisdiction over Defendant because Defendant is a Delaware limited liability company or other business entity which conducts business in the State of New York and has its principal executive offices located in New York, New York. Defendant further conducts sufficient business with sufficient minimum contacts in New York, and/or otherwise intentionally avails itself to the laws of New York and the New York market through the operation of Brooks Brothers Factory outlet stores within the State of New York.

11.    Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## III.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

12.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of its Brooks Brothers Factory outlet merchandise at its Brooks Brothers Factory outlet stores.

13.    Retailers like Defendant can and do benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get *higher margins*, but also *increase sales*." Staelin et al., *supra*, at 835 (emphasis added). This is because

consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[3] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[4]

14.     Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Nobel Prize-winning

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, 16 no. 1 J. LAW & ECON. 67, 68-69 (1973).

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. 78, no. 2 J. POL. ECON. 311, 311-12 (1970).

[5] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.2, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*, 4, no. 3 MKTG. SCI. 199, 212 (1985) [hereinafter Thaler, *Mental Accounting*] ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.2, at 52.

[7] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*, 13 no 3 J. OF CONSUMER PSYCH. 328 (2003).

economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[8]

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher

---

[8] "To incorporate . . . the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting*, *supra* n.6, at 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, 19 no. 1 J. OF CONSUMER RSCH. 62, 68 (1992) [hereinafter Mayhew & Winer, *An Empirical Analysis*].

[10] Mayhew & Winer, *An Empirical Analysis*, *supra* n.10, at 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* 62 J. OF MKTG. 46, 48 (1998) [hereinafter Grewal et al., *The Effects of Price-Comparison Advertising*].

[12] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting*, *supra* n.6, at 212.

for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

16.     In Staelin, *Regulation of Fictitious Pricing*, published just last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[16] and notes that the findings

---

[13] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*, 18 no.1 J. PUB. POL'Y & MKTG. 3, 7 (1999) [hereinafter Grewal & Compeau, *Pricing and public policy*].

[14] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. 14, no. 3 MKTG. SCI. G161 (1995); *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 no. 1 J. OF APPLIED BUS. RSCH. 59, 65-66 (1990) [hereinafter Gotlieb & Fitzgerald, *An Investigation*] ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[15] Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[16] *See* Staelin et al*., supra*, at 826 ("***It is now well accepted*** that many consumers get ***extra utility***, beyond that associated with consuming a product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.    Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[17] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendant's product because, as Staelin *et al.* put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***." *Id.* at 835 (emphasis added).

**B.    Defendant Engages in a Fraudulent Price Discounting Scheme.**

19.    Defendant is a specialty retailer of men's and women's business and casual apparel. For years, Defendant has engaged in a harmful fake discounting scheme by advertising its Brooks Brothers Factory merchandise at discounted "sale" prices in their Factory outlet stores located in New York and California. Defendant's scheme consists of marketing the "sale" prices as discounts

---

[17] Staelin et al., *supra*, at 826 (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

from the former, "original" prices listed on the products' price tags. In most cases, the items are accompanied, either individually or in a small group, by a placard in the immediate vicinity advertising a certain percentage off ("__%") the former, "original" price. In a minority of other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price tag price.

20.    The percentage-off and whole-price reduction discount placard signs inside New York and California Brooks Brothers Factory stores are universally printed on black card stock with bold, white lettering advertising the fake discount. Defendant does *not* advertise or otherwise disclose the date on which any item was last offered for its "original" price.

21.    The photos below demonstrate Brooks Brothers Factory's uniform storewide practice in place at all Brooks Brothers Factory stores. [18]



---

[18] *See* **Exhibit A**, additional Brooks Brothers Factory outlet in-store photographs depicting the extent and pervasiveness of Defendant's pricing scheme.











22.    As shown in the above photos—and throughout **Exhibit A**—Defendant's "original" (a/k/a "ticket" or "price tag") prices are unadorned by any qualifying language that could arguably direct consumers to compare Defendant's reference price and purported discount to any *other* market outside of the particular Brooks Brothers Factory store where it is being advertised. This reasonable impression is reinforced by Defendant's pervasive use of percentage-off discounts and whole-price reduction (i.e., "Now …") signs, which denote limited-time discounts from **former, "original" prices**.[19] Thus, Defendant's reference and "discount" price advertisements are not advertising a comparison to any other stores, including Brooks Brothers' own mainline retail stores.

23.    Additionally, Plaintiffs are informed and believe and thereon allege that virtually all of the merchandise sold at Brooks Brothers Factory stores is manufactured for and sold exclusively at Brooks Brothers Factory outlet stores.[20] Plaintiffs are further informed and believe and thereon allege that Brooks Brothers Factory outlet merchandise (i.e., merchandise available for sale at the Brooks Brothers Factory stores) bearing the number 27 on its price tag indicates that the item is manufactured for sale exclusively at Brooks Brothers Factory Stores ("made-for-outlet"

---

[19] *See Vizcarra v. Michaels Stores, Inc.*, 710 F. Supp. 3d 718, 725 (N.D. Cal. 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

[20] *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *see, e.g.*, *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017); *Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015)

or "MFO") and is sold nowhere else. *See* **Exhibit A** at 5, 8, 10, 13, 15, 17, 23-26, 28-29, 32-34, 40-41, 46, 50-52, 54, 56, 59, 62, 71, 75, 79, 85, 90, 92. 94-95, 98-99, 105.  The exclusivity of Defendant's Factory merchandise is further evidenced by the different "sizing structures" applied to Defendant's Factory store vs. mainline retail merchandise. *See Dress Shirts: Factory & Retail*, Brooks Brothers, https://www.brooksbrothers.com/support?a=Dress-shirts%3A-Factory-and-Retail---id--PgDhi5M0QuC76zERbWcsdw (last accessed Nov. 8, 2024) ("Brooks Brothers offers a different sizing structure for our factory outlet dress shirts than our mainline dress shirts.").

24.    Moreover, because Defendant's price tag reference prices convey a former, "original" price, they are not styled as "Compare At" or "Comparable Value" pricing representations, which could arguably put consumers on notice to look outside of that particular store to understand the value of the purported discount. In those schemes an advertiser compares its prices to those of competitors using words such as "compare at" or "comparable value" on its price tags to qualify its reference prices. Accordingly, Plaintiffs are *not* required to "'assert evidence from which a rational trier of fact could infer that the ***comparative*** reference price was inaccurate[,]'" because "th[at] situation ***only arises when the language of the advertisement implies a comparison to another retailer***." *Harris v. PFI W. Stores, Inc.*, No. SACV192521JVSADSX, 2020 WL 3965022, at *4 (C.D. Cal. Apr. 9, 2020) (citing *Sperling*, 291 F. Supp. 3d at 1085-86 and *Horosny v. Burlington Coat Factory of California, LLC*, No. CV1505005SJOMRWX, 2015 WL 12532178, at *6 (C.D. Cal. Oct. 26, 2015) (emphasis added). Thus, because consumers are not put on notice to check the Brooks Brothers Factory prices against any outside market, it is irrelevant to Defendant's liability whether its Brooks Brothers Factory outlet items are sold in other markets, like Brooks Brothers Factory's mainline retail store or department stores (they are not).

25.     Plaintiffs are informed and believe and thereon allege that, at some point in or around mid-2024, Defendant attempted to cover its tracks by adding removable stickers bearing the words "Comparable Value" to some of its Brooks Brothers Factory store merchandise price tags. Upon affixing these removable stickers to the price tags, Defendant did not make any effort to *change* the reference prices on the price tags and so, consequently, the addition of the "Comparable Value" stickers is essentially an admission that the reference prices are completely fictitious, arbitrary, capricious, and deceptive. This is particularly true with respect to Defendant's MFO Brooks Brothers Factory store merchandise, which is not even offered for sale anywhere outside of Brooks Brothers Factory stores. *See Branca II*, 2015 WL 10436858, at *7 (The plaintiff adequately alleged "why the 'Compare At' prices are false as former prices—because they necessarily cannot be former prices or prevailing market prices, as the items were never sold elsewhere for any other price besides the Nordstrom Rack retail price"). In other words, where, as in this case, the merchandise is exclusive to the Defendant's outlet store, there is no other relevant market from which consumers as "Compare" any prices, making the use of "Compare At" or "Comparable Value" qualifiers, like Defendant's here, inherently misleading.

26.     Additionally, Plaintiffs are informed and believe and thereon allege that the merchandise offered for sale and sold in Brooks Brothers Factory stores in California and New York is the same. There is also no meaningful difference in Defendant's Brooks Brothers Factory outlet inventory in California and New York—the same products are sold at every store and the same fraudulent pricing scheme is deployed uniformly.

27.     Further, because the Brooks Brothers Factory Store products are never—or virtually never—offered for sale, much less actually sold, at their "original," "price tag" prices, those prices and their accompanying "discounts" are fraudulent: they are used solely to induce

consumers to make purchases and spend more under the reasonable, but incorrect, belief that the merchandise was recently sold (and will be again soon if the consumer does not act) at its advertised reference price in either the Brooks Brothers Factory store or the Brooks Brothers mainline store (which sells higher quality Brooks Brothers-branded merchandise) at a significant discount when, in fact, they are purchasing inferior quality, ***made-for-factory-outlet***, merchandise that has never been offered outside of a Brooks Brothers Factory store and, even there, never (or virtually never) at the higher "original" price advertised on its price tag.

28.     Even if Defendant did offer the Brooks Brothers Factory outlet products at their full reference price (they do not), that offering would do little to legitimize Defendant's practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public ***on a regular basis for a reasonably substantial period of time***." 16 C.F.R. § 233.1(a) (emphasis added). Nor would such rare offerings constitute the "prevailing market price" within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, Cal. Bus. & Prof. Code § 17501, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement[,]" which Defendant also fails to do on *all* advertisements. Rather, the advertised reference prices on Brooks Brothers Factory merchandise are *not* the price at which Defendant regularly (or ever) sells, or expects to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

29.     In sum, Defendant's fake discount scheme is intended to (and does) increase Defendant's sales while depriving consumers of the benefit of their bargain and causing them to spend more money than the Factory store items are actually worth—the price they could command

in the absence of the fake discount.[21] This conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information and results in the illegal imposition of a price premium the Factory store merchandise could not and would not otherwise command, which consumers, like Plaintiffs, are duped into paying.

### C. Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.

30.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[22] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[23] Consumers are misled and incorrectly overvalue Defendant's Factory products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[24]

---

[21] *See supra* n.17.

[22] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 212.

[23] Gotlieb & Fitzgerald, *An Investigation*, *supra* n.15, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

[24] Dhruv Grewal et al., *The Effects of Price-Comparison Advertising*, *supra* n.12, at 46.

31.     Accordingly, all consumers who purchase Brooks Brothers Factory merchandise are harmed by Defendant's pricing scheme because its impact pervades the entire market for Brooks Brothers Factory merchandise. This is because, again, the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin *et al*., *supra*, at 835. Thus, all Brooks Brothers Factory shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendant's Brooks Brothers Factory merchandise. All consumers who purchase falsely discounted Brooks Brothers Factory outlet products have overpaid and are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

32.     To put it differently, the fake discount information presented by Defendant's falsely advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer perception results in these consumers gaining an additional "transaction value"[25] on their outlet purchases, which they would not have otherwise gained but for Defendant's fake discounting scheme.

---

[25] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'"); Grewal & Compeau, *Comparative Price Advertising*, *supra* n.2, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

Consumers' valuation of Brooks Brothers Factory outlet merchandise therefore increases in the aggregate.

33.     Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived Factory outlet shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[26] The aggregate demand curve for a product, including Defendant's, represents consumers' valuation of that product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

34.     As a result, Defendant's pricing scheme impacts the market prices of its Brooks Brothers Factory outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Brooks Brothers Factory outlet prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiffs and proposed Class (defined below) members thus suffered a common impact from Defendant's misconduct.

**D.     Investigation**

35.     Plaintiffs' counsel has conducted a large-scale, comprehensive investigation into Defendant's fake discounting scheme at its Brooks Brothers Factory outlet stores. Plaintiffs'

---

[26] Mankiw, N. *Essentials of Economics*, 8th Edition. Boston, MA: Cengage Learning, 66 (2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis.* 3rd Edition. New York, NY: W. W. Norton & Company, at 23-38, 144-57, 233-353 & 285-312 (1992).

counsel has tracked items in Defendant's Brooks Brothers Factory outlet stores in California from April 18, 2024, through present,[27] as well as in New York. Attached as **Exhibit B** to this Complaint is a list of exemplary products tracked in California.

36.     From those efforts, Plaintiffs are informed that Defendant's Brooks Brothers Factory outlet pricing scheme (i.e., the manner in which the reference prices and purported discounts are conveyed to shoppers) appear uniform at *every* location, regardless of what state it is in or when the observation was made.[28] The only thing that changed was the advertised discount and/or reference price on certain merchandise. Indeed, all products observed appear to have remained "on sale" throughout the investigation, "discounted" against a false reference price that has never been observed as the actual selling price. In other words, all items had price tags that were then perpetually "discounted" by in-store signage indicating a large percentage off ("__% Off") or whole-price reduction discount. Accordingly, Plaintiffs are informed and believe and thereon allege that Brooks Brothers Factory outlet store merchandise is never offered for sale at its full "original" price—and certainly not "on a regular basis for a reasonably substantial period of time," as required by 16 C.F.R. § 233.1.

37.     Thus, the investigation confirms that the "original" or "price tag" reference price of the items Plaintiffs purchased were never the actual selling price of those items because they were never offered at those prices, but rather continuously offered for sale at fake discount prices. The investigation confirmed that this was a pervasive, uniform, and systematic practice at the

---

[27] As of November 15, 2024, the last visit was November 13, 2024.
[28] *See, e.g.*, **Exhibit A**.

Defendant's Brooks Brothers Factory outlet stores, as thousands of items remained continuously discounted throughout the investigation period, including those products purchased by Plaintiffs.[29]

38.      In short, the false discounting scheme used by Defendant on its Brooks Brothers Factory outlet merchandise is uniformly and identically applied on all, or virtually all, of the Brooks Brothers Factory products sold throughout Defendant's California and New York brick-and-mortar outlet stores.

---

[29] Numerous false discount pricing cases brought in California federal district courts have held that, notwithstanding [FRCP] Rule 9(b) (not applicable here), that plaintiffs are **not** required to perform or provide **any** specific details pertaining of pre-lawsuit investigations into false discounting practices in order to defeat a motion to dismiss. *See, e.g.*, *Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos*, 2016 WL 1730001, at *3–4 (complaint lacking in any allegations related to pre-suit investigation of false discounting practice satisfied Rule 9(b); *Knapp*, 2016 WL 3268995, at *4 (allegations of "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (denying motion to dismiss where plaintiff pled existence of deceptive pricing scheme "on information and belief" only, without investigation); *see also Le v. Kohls Dept. Stores, Inc.*, 160 F.Supp.3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold). Still, complaints containing pre-suit investigation allegations similar to Plaintiff's here have routinely been sustained over motion to dismiss challenges, in California federal courts as well as state courts which notably *do not* apply Federal Rule 9(b)'s heightened pleading standard for actions sounding in fraud. *See, e.g.*, *Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris*, 2020 WL 3965022, at *1; *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint); *Schertzer v. Alpargatas USA Inc* (Super. Ct. San Diego, 37-2019- 00015352, Dkt. No 45).

39.     Despite Plaintiffs' counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendant's possession.

## IV.     PARTIES

**Plaintiff Kenneth Guerriero**

40.     Plaintiff Guerriero resides in New York, New York. On or about November 12, 2023, Plaintiff Guerriero went shopping for some new clothing at the Brooks Brothers Factory outlet store located at Woodbury Commons in Central Valley, New York. In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Guerriero purchased a red V-neck cashmere sweater, size small, that bore an "original" (reference) price of $79.99 and a purported 30%-off discount (-$24.00), for an actual sales price of approximately $55.99. Plaintiff Guerriero paid an after-tax total of $58.30.

41.     During his time at the Brooks Brothers Factory outlet store on November 12, 2023, Plaintiff Guerriero browsed several items before deciding on what items to purchase. After reviewing the advertised reference and "sale" price for the above-described sweater, Plaintiff Guerriero decided to purchase the items. During his time there on November 12, 2023, Plaintiff Guerriero noticed numerous signs within the Brooks Brothers Factory outlet store advertising various "__%"-off discounts on items throughout the store.

42.     Indeed, after observing the original price of the item and the accompanying sale price, Plaintiff Guerriero believed he was receiving a significant discount on the item he had chosen. His belief that the discounted prices on the items were limited and would not last was material and integral to his purchase decision. He would not have made the purchases were it not for the significant bargain he thought he was receiving. However, Plaintiff Guerriero did not

receive the benefit of her bargain and, in reality, paid more for the items than they were worth in the form of a premium as a result of the fake sale scheme.

43.     Plaintiff Guerriero has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiff Tony Sikavi**

44.     Plaintiff Sikavi resides in Los Angeles, California. On or about September 10, 2023, Plaintiff Sikavi went shopping for some new clothing at the Brooks Brothers Factory outlet store located at the Cabazon Outlets in Cabazon, California. In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Sikavi purchased a suit jacket that bore an "original" (reference) price of approximately $523.50 and a purported 25%-off discount (-$130.88), for an actual sales price of approximately $392.62. Plaintiff Sikavi paid an after-tax total of $429.93.

45.     During his time at the Brooks Brothers Factory outlet store on September 10, 2023, Plaintiff Sikavi browsed several items before deciding on what items to purchase. After reviewing the advertised reference and "sale" price for the above-described jacket, Plaintiff Sikavi decided to purchase the items. During his time there on September 10, 2023, Plaintiff Sikavi noticed numerous signs within the Brooks Brothers Factory outlet store advertising various "__%"-off discounts on items throughout the store.

46.     Indeed, after observing the original price of the item and the accompanying sale price, Plaintiff Sikavi believed he was receiving a significant discount on the item he had chosen. His belief that the discounted prices on the items were limited and would not last was material and integral to his purchase decision. He would not have made the purchases were it not for the significant bargain he thought he was receiving. However, Plaintiff Sikavi did not receive the

benefit of his bargain and, in reality, paid more for the items than they were worth in the form of a premium as a result of the fake sale scheme.

47.    Plaintiff Sikavi has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

### Plaintiffs' Economic Injury Is Readily Quantifiable

48.    Plaintiffs have been injured and incurred quantifiable actual damages as a result of Defendant's fraudulent pricing scheme, which can be and has been preliminarily calculated through the use of regression analysis.

49.    Plaintiffs overpaid for the products they purchased as described herein. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiffs to overpay. Despite Plaintiffs' original belief that the products they purchased were discounted and, thus, that their value was significantly greater than the sale price for which they purchased them, Plaintiffs, in actuality, paid an *inflated* price for all of the supposedly discounted products they purchased. In other words, both the reference prices and the actual selling prices of the items Plaintiffs purchased were inflated, but for different reasons: the reference prices because Defendant intentionally fabricated them and the actual selling prices because if Defendant had not engaged in the false discounting scheme, then those items would not have commanded such high, i.e., *inflated*, prices. Thus, the items Plaintiffs purchased were all worth less than the amounts they paid for them.

50.    Plaintiffs were damaged in their purchases because Defendant's false reference price discounting scheme inflated the final selling price of the items they purchased, such that Defendant's false reference price discounting scheme caused Plaintiffs to pay a price premium. Defendant's false reference price discounting scheme artificially inflated consumer demand, such

that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendant not engaged in a false reference pricing scheme. Plaintiffs would not have purchased the merchandise, or would have paid less for it, but for Defendant's representations regarding the false reference prices and purported discounts of the merchandise. Plaintiffs were misled into believing that they were receiving substantial savings on the purchase of Defendant's products, which was implied by the falsely advertised reference prices.

51.     Here, for purposes of investigation and determining a preliminary measure of damages, Plaintiffs, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendant's product SKUs and pricing practices attached to each SKU. Plaintiffs, through the use of sophisticated regression analysis, were able to determine the objective measure by which Plaintiffs and Class members overpaid for the goods they purchased.[30]

52.     Reference guides on regression-based damages describe how "[p]ractitioners can use several tools to establish and measure relations among the variables that affect revenues and costs, and thus establish the casual link … Regression analysis applies a statistical technique to develop an equation depicting the relation among variable and then uses that equation for prediction."[31] In this case, Plaintiffs' consultants utilized regression analysis to estimate the

---

[30] Notably, if the "misrepresentation ... artificially inflate[s] the market price of a product, causing [Plaintiffs] to pay more for it than [they] otherwise would have—regardless of whether [they] even saw the misrepresentation," the plaintiffs were "harmed [ ] by a misrepresentation without necessarily having relied on it." *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *10 (S.D.N.Y. Aug. 13, 2020). Under this "theory of causation … that the advertising and labeling practice allowed a price premium to be charged" is often known as a "market-price-based theory of causation." *Id.* at *11 (citation and internal quotation marks omitted). This theory, "unlike the promise-based theory, does not depend on the consumer's awareness of the representation." *Id.*

[31] Roman L. Weil et al., *Litigation Services handbook: the role of the Financial Expert* Ch. 4, p. 25 (6th ed. 2017).

relationship between Defendant's reference prices and Defendant's selling prices, after accounting for the other factors that influence Defendant's pricing, and used that equation to predict prices that would have occurred but for misconduct in this case. As explained below, the regression analysis relies on Defendant's data and measures how selling prices increase when the intensity of its misconduct is greater (i.e. a higher reference price leads to higher selling price, holding all else equal).

53.    Plaintiffs' experts used the data collected during the investigation to analyze 133 products offered for sale within Defendant's Brooks Brothers Factory stores during the Class Period (defined below). The average selling price within this data sample was $80.77, whereas the average reference price was $148.10. Thus, on average, the reference price chosen by Defendant was $67.33 higher (or 83.4% higher) than the selling price.

54.    Plaintiffs' experts used this data as input (among additional control variables affecting price, described below) to perform a regression model which allowed them to calculate the price premium paid by Plaintiffs, and all similarly situated proposed Class members, for each product purchased. The regression model incorporates supply and demand factors through the use of *actual selling prices*, which are the net result of the competitive factors that influence Defendant's pricing. For example, the price of an item at issue in this case is a function of its component features (e.g., is the item a top, dress, or jacket? Is the item marketed towards women or men?). The net effect of the demand factors (e.g., consumer willingness to pay for an item based on its features) and supply factors (e.g., Defendant's production costs) are captured within the product's attributes when actual selling prices are used in this type of regression analysis.

55.    While additional variables will be accounted for after more detailed data is provided by Defendant or elsewhere during discovery, ***this initial regression analysis already accounts for***

*11 variables that impact Defendant's pricing* (including reference price). For the example, the regression analysis accounts for product type (e.g., Outwear, Top, Dress, Bottom, Tie, Boxers, Pajamas, and Socks) and target gender demographic (e.g., men's vs women's).

56.    After accounting for these product characteristics, the regression finds a coefficient of 0.55. In other words, the regression finds that increasing the reference price by $1 results in an increase of 55¢ in the selling price of items at Brooks Brothers Factory stores.

57.    The corresponding regression equation is then used to predict selling prices if the reference price was reduced to the typical selling price of the item (i.e., lowering the reference price to remove the impact of the pricing misconduct). For example, as previously discussed, the preliminary data suggests that Defendant's reference prices were $67.33 higher (or 83.4% higher) than the actual sales prices, on average. When combined with the preliminary regression results described above, this $67.33 differential implies that selling prices were approximately $37.03 higher, on average, due to the false discounting scheme alleged in this case.[32] This average overcharge of $37.03 represents approximately 45.8% of the average purchase price within the data collected by Plaintiffs.[33]

58.    These results will be revised somewhat once Plaintiffs receive additional pricing data (i.e., daily histories of reference and sale prices for many more SKUs during the Class Period), but even the data collected by Plaintiffs' counsel demonstrates that Plaintiffs and others similarly situated paid a price premium as a direct result of the false discounting scheme practiced universally at Brooks Brothers Factory stores. Plaintiffs will seek in-depth discovery of internal documents, digitally stored historic pricing data, and depositions of persons most knowledgeable

---

[32] That is, $67.33 x 0.55 = $37.03.

[33] That is, $37.03 / $80.77 = 45.8%.

about Defendant's practices to supplement this investigation, show common injury at class

certification, and prove damages with reasonable certainty at trial.

59.    The table below shows the application of the preliminary regression coefficient

(0.55) to the items purchased by Plaintiffs and the resulting measure of injury.[34]

| Item | Delta (Δ) Between Reference and Sale Price | Coefficient (0.55) | Damages (Δ x 0.55) |
|---|---|---|---|
| Red V-Neck Cashmere Sweater | $24.00 | 0.55 | $13.20 |
| Suit Jacket | $130.88 | 0.55 | $71.98 |

60.    The harm to Plaintiffs and Class members (i.e., price premium) caused by

Defendant's misconduct can also be objectively measured through the use of conjoint analysis

supported by Defendant's historic pricing, sales, and other market data, which will also be pursued

vigorously in discovery, to isolate the price premium associated with Defendant's false reference

price and discounting scheme.

61.    Conjoint analysis is a well-accepted survey-based technique in which survey

participants select their most preferred product from a series of product options with different

attributes (including price).[35] The researcher will then analyze consumers' trade-offs among

products with different features using a statistical model that allows the researcher to estimate the

influence of each product attribute and the willingness-to-pay ("WTP") for a particular product

---

[34] This exercise can be performed for every product Defendant has sold at Brooks Brothers Factory stores at a purported discount by multiplying the regression coefficient by that item's reference price/sales price differential. Once enough historical pricing and sales data is provided to Plaintiffs' experts to perfect the regression coefficient, measuring the harm to each Class member will be a simple mechanical exercise.

[35] "The key characteristic of conjoint analysis is that respondents evaluate product profiles composed of multiple conjoined elements (attributes or features). Based on how respondents evaluate the combined elements (the product concepts), we deduce the preference scores that they might have assigned to individual components of the product that would have resulted in those overall evaluations" (Orme, B. "A Short History of Conjoint Analysis." Chapter 4 in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. Second Edition, Madison, WI: Research Publishers LLC, 2010, p. 29).

attribute. In other words, conjoint analysis can establish the extent to which consumer preferences (i.e., consumer demand, or WTP) change due to the alleged misconduct (i.e., false reference and discounting scheme) and, further, quantify its monetary impact on actual selling prices. After measuring the change in consumer preferences (and WTP) due to the alleged misconduct in this case, an overcharge is calculated by then incorporating *supply*-side behavior.

62.    As with hedonic regression, Plaintiffs can put forth an expert-based conjoint analysis with and/or without an economic market simulation to account for supply side factors[36] that will likewise demonstrate the price premium paid on products with inflated reference prices as compared to those without inflated reference prices. This approach will isolate the economic

---

[36] An economic market simulation estimates market prices by fully incorporating the relevant supply and demand information to estimate the but-for market prices that would have been paid by consumers in the absence of the alleged misconduct. It is used to incorporate supply side factors into the but-for world in which consumers' WTP has adjusted due to the absence of the alleged misconduct. Market simulations often incorporate (and are calibrated to) real-world supply and demand market data on the Defendant's (and competitor's) products, prices, costs, market share, consumer decisions (*e.g.*, mixed logit coefficients from conjoint analysis), and the price elasticity of consumer demand. Indeed, a wide body of academic literature in the economics discipline describes combining the consumer demand side of the market with the supply side of the market to determine market equilibrium prices. For example, Steven Berry, et al., Automobile Prices in Market Equilibrium, 63 *Econometrica* 841 (1995); Aviv Nevo, A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand, 9 *Journal of Economic and Management Strategy* 513-548 (2000); Steven Berry, et al., Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market, 112 *Journal of Political Economy* 68-105 (2004); Petrin, Amil, Quantifying the Benefits of New Products: The Case of the Minivan, 110 *Journal of Political Economy* 705–729 (2002); Greg Allenby, et al., Valuation of Patented Product Features, 57 *The Journal of Law & Economics* 629-663 (2014). Within the context of consumer class action litigation, various courts have accepted damages models based on economic market simulations that incorporate the findings of a conjoint analysis with additional supply-side factors. *See, e.g., Wesley Won et al. v. General Motors*, *LLC*, No. 2:19-cv-11044 (DML) (DRG) (E.D. Mich., July 28, 2022); *Thomas Allegra et al. v. Luxottica Retail North America, d/b/a Lenscrafters*, No. 17 CV-5216 (PKC) (RLM) (E.D.N.Y., Dec. 13, 2021); *Riley Johannessohn, et al. v. Polaris Industries*, *Inc*., No. 16-cv-03348 (NEB/LIB) (D. Minn., Mar. 31, 2020) ("There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world").

harm to Class members due solely to Defendant's misconduct and will demonstrate that otherwise identical products sold *without* reference prices ultimately cost less.

63.     Accordingly, objective measures demonstrate that Plaintiffs overpaid for the Brooks Brothers Factory store merchandise they purchased. The difference between the actual sales price paid by Plaintiffs due to the artificially increased demand for the products—caused by Defendant's false discounting scheme—and the market sale price that the products would have commanded without Defendant's misconduct provides an objective measure by which Plaintiffs was overcharged and injured by Defendant. The amount of inflation of the prices for the Brooks Brothers Factory store merchandise Plaintiffs purchased caused by Defendant's deception thus measures how much Plaintiffs overpaid. As shown above, this amount can be quantified using regression analysis based on Defendant's historic pricing data and/or through conjoint analysis (with or without a market simulation). Plaintiffs' allegations therefore sufficiently allege a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 (1999). *See also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (requiring allegations that, "on account of a materially misleading practice, [plaintiff] purchased a product and did not receive the value of her purchase") (emphasis added).

**Plaintiffs Have Standing for Injunctive Relief and Lack An Adequate Remedy at Law**

64.     Plaintiffs are also susceptible to the same harm reoccurring, and therefore require an injunction (i.e., Plaintiffs lack an adequate remedy at law), because they cannot be certain that Defendant will have corrected this deceptive pricing scheme, and they desire to shop at Defendant's Brooks Brothers Factory stores in the future because they like the brand and the clothing styles offered. Further, due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Brooks Brothers Factory stores, Plaintiffs will be unable to parse what

prices are inflated and untrue, and what prices are not. Plaintiffs simply do not have the resources to ensure that Defendant is complying with California, New York and federal law with respect to its pricing, labeling, and/or advertising of Brooks Brothers Factory store outlet merchandise.

65.    Further, because of the wide selection of merchandise available at Defendant's Brooks Brothers Factory outlet stores, the sheer volume of products involved in Defendant's deceit (i.e., on information belief, virtually all of them), and the likelihood that Defendant may yet develop and market additional Brooks Brothers Factory store outlet merchandise items for sale, Plaintiffs may again, by mistake, purchase a falsely discounted product at one of the Brooks Brothers Factory stores under the reasonable, but false, impression that Defendant had corrected the scheme and that its reference price advertisement represented a *bona fide* former price at which the item was previously offered for sale by Defendant. However, without a substantial, time-consuming, and costly investigation, Plaintiffs will have no way of knowing whether Defendant has deceived them again.

66.    Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiffs, Class members, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiffs, Class members, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiffs, as well as California and New York consumers at large, the appropriate assurances.

67.    Plaintiffs additionally lack an adequate remedy at law with respect to claims for equitable restitution because they have not yet retained an expert to perform the damages model

that will determine whether an award of actual damages can or will adequately remedy monetary losses versus what an award of equitable restitution would provide. For instance, legal damages tend to focus on remedying the actual out-of-pocket monetary loss (reliance damages) or loss in an expectancy (benefit of the bargain damages). Equitable restitution, on the other hand, focuses distinctly on restoring monies wrongly *acquired* by the defendant. For instance, Plaintiff Sikavi lacks an adequate remedy at law to the extent he and California Class members have suffered damages as measured by the difference between the price paid and the value represented (i.e., benefit of the bargain damages), California law prohibits consumers from recovering that measure of damages, but it does not prohibit them from recovering that measure as equitable relief. *See* Cal. Civ. Code § 3343. Accordingly, at this juncture, Plaintiffs can, and do, credibly allege that legal damages are inadequate as they do not know whether the model for actual damages (as opposed to restitution) will even be viable or cover the same amount of harm.[37]

68.    Plaintiff Sikavi further lacks an adequate remedy at law because the UCL (an equitable cause of action) carries a statute of limitations of four years, while the CLRA (which can provide legal damages *and* equitable restitution) carries a shorter, three-year statute of limitations. Cal. Bus. & Prof. Code § 17208; Cal. Civ. Code § 1783. Thus, dismissal of Plaintiff Sikavi's (equitable) UCL claims would wipe out an entire year's worth of monetary recovery for the California Class.

---

[37] Decisions in numerous false discounting cases have accepted similar allegations where the defendant has challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g.*, *Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021)*; Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10.

69.     Finally, Plaintiff Sikavi lacks an adequate remedy at law because the UCL "sweeps more broadly than the CLRA." *Allen v. Hylands, Inc.*, 773 F. App'x 870, 874 (9th Cir. 2019). While Plaintiff Sikavi's claim under the "fraudulent" prong of the UCL is subject to the same "reasonable consumer" test as the CLRA, his claim under the "unfair" prong is more far-reaching, and, as alleged below, liability may be found if Defendant's practices "offended an established public policy of transparency in pricing" or are "immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers." These tenets of liability seek to remediate broader harm for which there is no corollary under the CLRA, making legal damages inadequate. Accordingly, Plaintiffs may set forth alternate claims for legal damages and equitable restitution.

**Defendant**

70.     Defendant Authentic Brands Group, LLC is a Delaware limited liability company with its principal executive offices in New York, New York. Plaintiffs are informed and believe that Defendant Authentic Brands Group, LLC owns and operates Brooks Brothers Factory outlet stores in New York and California, in addition to other states across the United States, and advertises, markets, distributes, and/or sells Brooks Brothers-brand clothing and accessories in New York, California and throughout the United States.

71.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Classes as alleged herein. Plaintiffs will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

72.     Defendant knows that its reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under California, New York and federal law.

73.     Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiffs and other members of the proposed Classes the truth about its advertised discount prices and former reference prices. Defendant concealed from consumers the true nature and quality of the products sold at its Brooks Brothers Factory outlet stores.

74.     Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiffs and the proposed Classes to purchase Brooks Brothers Factory outlet products.

75.     At all relevant times, Defendant has been under a duty to Plaintiffs and the Classes to disclose the truth about its false discounts.

## V.      CLASS ALLEGATIONS

76.     Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Classes against Defendant:

**New York Class**

All persons who, within the State of New York and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Brooks Brothers Factory outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

**California Class**

All persons who, within the State of California and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Brooks Brothers Factory outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Classes is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of its respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more classes, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

77.    ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs.

78.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether, during the Class Periods, Defendant used false advertised reference prices on its Brooks Brothers Factory outlet product labels and falsely advertised price discounts on merchandise sold in its outlet stores;

b.    whether Defendant ever offered items for sale or sold items at their advertised reference price;

c.    whether, during the Class Periods, the original price advertised by Defendant was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.    whether, during the Class Periods, any of the original prices advertised by Defendant were false or misleading;

e.    whether Defendant's purported sale prices advertised in its Brooks Brothers Factory outlet stores reflected any actual discounts or savings;

f.    whether Defendant's purported percentage-off discounts advertised in its Brooks Brothers Factory outlet stores reflected any actual discounts or savings;

g.    whether Defendant's alleged conduct constitutes violations of the laws asserted;

h.    whether Defendant's alleged conduct constitutes violations of federal and/or New York and/or California pricing regulations;

i.    whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

j.    whether Plaintiffs and Class members are entitled to damages and the proper measure of that loss; and

k.    whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparisons.

79.    ***Typicality***: Plaintiffs' claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

80.    ***Adequacy***: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained counsel experienced in complex consumer class action litigation,

and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Classes.

81.    ***Superiority***: The nature of this action and the nature of laws available to Plaintiffs and the Classes make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Classes for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

82.    All Class members, including Plaintiffs, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, and advertising scheme, disseminated in a years-long campaign to New York and California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Classes. In addition, it can be reasonably presumed that all Class members, including Plaintiffs, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold at Brooks Brothers Factory outlet stores.

83.    Plaintiffs are informed that Defendant keep extensive computerized records of its Brooks Brothers Factory outlet customers through, *inter alia*, customer loyalty programs, credit

card programs, and general marketing programs. Defendant has one or more databases through

which a significant majority of Class members may be identified and ascertained, and it maintains

contact information, including email and home addresses, through which notice of this action could

be disseminated in accordance with due process requirements.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of New York Consumer Protection from Deceptive Acts and Practices Act ("NYDAPA")**
**N.Y. GEN. BUS. LAW § 349, *et seq.***
***(On Behalf of Plaintiff Guerriero and the New York Class)***

84.    Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

85.    Plaintiff Guerriero brings this claim individually and on behalf of the members of

the proposed New York Class against Defendant for violations of NYDAPA, N.Y. Gen. Bus. Law

§ 349.

86.    NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any

business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendant's conduct, as set forth herein,

constitutes deceptive acts or practices under this section.

87.    Plaintiff Guerriero and members of the proposed New York Class are "persons"

under NYDAPA, N.Y. Gen. Bus. Law § 349(h), and Defendant's actions as set forth herein

occurred in the conduct of "business, trade or commerce" under NYDAPA.

88.    In the course of its business, Defendant advertised false reference prices that gave

consumers, including Plaintiff Guerriero and members of the proposed New York Class, the

impression that its products were regularly sold on the market for a substantially higher price than

they actually were; therefore, leading to the false impression that the products sold at Defendant's Brooks Brothers Factory outlet stores were worth more than they actually were.

89.    Plaintiff Guerriero and members of the proposed Class had no way of discerning that Defendant's representations were false and misleading.

90.    Defendant thus violated and continues to violate NYDAPA by making statements that, when considered as a whole from the perspective of a reasonable consumer, gives the false impression that the products sold at Defendant's Brooks Brothers Factory outlet stores are worth more than they actually are.

91.    Defendant knew or should have known that its conduct violated NYDAPA and owed a duty to Plaintiff Guerriero and members of the proposed New York Class to refrain from engaging in deceptive acts or practices, and to disclose the truth about its false discounts.

92.    Defendant intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of its men's and women's apparel and other Brooks Brothers Factory outlet products with intent to mislead Plaintiff Guerriero and members of the proposed New York Class.

93.    Defendant's misleading and false advertisements were material to Plaintiff Guerriero and members of the proposed New York Class, as they relate to the price of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

94.    Defendant's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff Guerriero and members of the proposed New York Class, about the price of its men's and women's apparel and other Brooks Brothers Factory

outlet products. Plaintiff Guerriero and members of the proposed New York Class reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the men's and women's apparel and other Brooks Brothers Factory outlet products from Defendant's Brooks Brothers Factory outlet stores. Plaintiff Guerriero and members of the proposed New York Class would not have made such purchases but for Defendant's representations regarding the substantial discount being offered for the product.

95. Defendant's violation of NYDAPA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff Guerriero, members of the proposed New York Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff Guerriero and members of the proposed New York Class.

96. As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff Guerriero and members of the proposed New York Class suffered ascertainable loss and actual damages.

97. Plaintiff Guerriero and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including, but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## SECOND CAUSE OF ACTION

**Violation of New York False Advertising Act ("NYFAA")**
**N.Y. GEN. BUS. LAW § 350, *et seq.***
***(On Behalf of Plaintiff Guerriero and the New York Class)***

98.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

99.     Plaintiff Guerriero brings this claim individually and on behalf of the members of the proposed New York Class against Defendant for violations of NYFAA, N.Y. Gen. Bus. Law § 350.

100.     The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350(a).

101.     Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's actual sale price), constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendant's Brooks Brothers Factory outlet stores were worth more than they actually were.

102.     Defendant intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the prices of its men's and women's apparel and other Brooks Brothers Factory outlet products with intent to mislead Plaintiff Guerriero and members of the proposed New York Class.

103.    Defendant's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff Guerriero and members of the proposed New York Class, about the price of its men's and women's apparel and other Brooks Brothers Factory outlet products. Plaintiff Guerriero and members of the proposed New York Class reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the men's and women's apparel and other Brooks Brothers Factory outlet products from Defendant's Brooks Brothers Factory outlet stores. Plaintiff Guerriero and members of the proposed New York Class would not have made such purchases but for Defendant's representations regarding the substantial discount being offered for the product.

104.    Defendant's violation of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff Guerriero, members of the proposed New York Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff Guerriero and members of the proposed New York Class.

105.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff Guerriero and members of the proposed New York Class suffered ascertainable loss and actual damages.

106.    Plaintiff Guerriero and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYFAA, including, but not limited to, injunctive relief, recovery of actual damages and/or five hundred dollars per violation, whichever

is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court

deems proper.

### THIRD CAUSE OF ACTION

**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
***(On Behalf of Plaintiff Sikavi and the California Class)***

107.    Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

108.    Plaintiff Sikavi brings this claim individually and on behalf of the members of the

proposed California Class against Defendant for violations of the UCL, Cal. Bus. & Prof. Code

§§ 17200, *et seq*.

109.    The UCL defines "unfair business competition" to include any "unlawful, unfair or

fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.

Cal. Bus. Prof. Code § 17200.

110.    The UCL imposes strict liability. Plaintiff Sikavi and members of the proposed

California Class need not prove that Defendant intentionally or negligently engaged in unlawful,

unfair, or fraudulent business practices—but only that such practices occurred.

#### *"Unfair" Prong*

111.    A business act or practice is "unfair" under the UCL if it offends an established

public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to

consumers, and that unfairness is determined by weighing the reasons, justifications and motives

of the practice against the gravity of the harm to the alleged victims.

112.    Defendant's actions constitute "unfair" business practices because, as alleged

above, Defendant engaged in misleading and deceptive price comparison advertising that

represented false reference prices and corresponding deeply discounted phantom "sale" prices.

Defendant's acts and practices offended an established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

113.    The harm emanating from this practice to Plaintiff Sikavi and members of the proposed California Class outweighs any utility it provides because Defendant's practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

### *"Fraudulent" Prong*

114.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

115.    Defendant's acts and practices alleged above constitute fraudulent business acts or practices as Defendant has deceived Plaintiff Sikavi and members of the California Class and is highly likely to deceive members of the consuming public. Plaintiff Sikavi and members of the California Class relied on Defendant's fraudulent and deceptive representations regarding its false ticket prices for products sold by Defendant. These misrepresentations played a substantial role in Plaintiff Sikavi's and members of the proposed California Class's decisions to purchase products at a purportedly steep discount, and Plaintiff Sikavi and members of the California Class would not have purchased products without Defendant's misrepresentations.

### *"Unlawful" Prong*

116.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

117.    Defendant's acts and practices alleged above constitute unlawful business acts or practices as Defendant has violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, like Defendant's, are described as deceptive practices that would violate the FTCA:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

118.    In addition, Defendant's acts and practices violate California law, which expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

> ***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

119.   Defendant violates § 17501 because it advertises items, including the items that Plaintiff Sikavi purchased and are described herein, with a former price that greatly exceeds the prevailing market price of those items. For the most part, Defendant advertises on its price tags a reference price that is unadorned by any qualifying language (e.g., "Compare At") which could arguably put consumers on notice to review prices outside of the Brooks Brothers Factory store.

120.   In so doing, Defendant reasonably conveys to consumers that these reference prices represent its *own* former price for that same merchandise. *See supra* n.20 (citing *Vizcarra*, 710 F. Supp. 3d at 725). Accordingly, the "prevailing" market price of those items can be measured exclusively by reference to Defendant's own historical sales data. *See Harris*, 2020 WL 3965022, at *4 (the need for allegations pertaining to a false discounting plaintiff's counsel's investigation of outside market "***only arises when the language of the advertisement implies a comparison to another retailer***.") (emphasis added); *see* ¶ 24.

121.   Thus, Defendant's internal sales data need only be reviewed to ascertain the "prevailing" market prices for the products at issue in this case. *See People v. Super. Ct. (J.C. Penney Corp., Inc.)*, 34 Cal. App. 5th 376, 410-13 (2019) (the "prevailing market price" is the most "common," "predominant," or "most widely occurring" price at which items are sold) (citing authorities).

122.   As detailed in the Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them

as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

123.    As detailed herein, and for the same reason that Defendant's acts and practices violate the FTCA and the FAL, they also violate the CLRA, thus establishing another "unlawful" act in violation of the UCL.

124.    Defendant's practices, as set forth above, misled Plaintiff Sikavi, the California Class, and the public in the past and will continue to mislead them in the future. Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

125.    Defendant's violations of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff Sikavi, members of the California Class, and the public who, if Defendant's false pricing scheme is permitted to continue, will continue to be deceived into purchasing products based on illegal price comparisons. These false price comparisons lead to artificial and increased demand which, in turn, leads to higher prices and financial harm for consumers like Plaintiff Sikavi and the members of the California Class as described herein. Because of the surreptitious nature of Defendant's deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendant's practice.

126.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff Sikavi and members of the California Class are entitled to preliminary and permanent injunctive relief enjoining Defendant from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiff Sikavi and the California Class of all Defendant's revenues wrongfully

obtained from them as a result of Defendant's unfair competition, or such portion of those revenues

as the Court may find equitable.

## FOURTH CAUSE OF ACTION

**Violation of California's False Advertising Law ("FAL")**
**CAL. BUS. & PROF. CODE §§ 17500, *et seq.***
***(On Behalf of Plaintiff Sikavi and the California Class)***

127.    Plaintiffs repeat and re-allege the allegations contained in every preceding

paragraph as if fully set forth herein.

128.    Plaintiff Sikavi brings this claim individually and on behalf of the members of the

California Class against Defendant for violations of California's FAL, Cal. Bus. & Prof. Code

§§ 17500, *et seq.*

129.    Cal. Bus. & Prof. Code § 17500 provides:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose
of . . . personal property or to perform services, professional or otherwise, or
anything of any nature whatsoever or to induce the public to enter into any
obligation relating thereto, to make or disseminate or cause to be made or
disseminated . . . from this state before the public in any state, in any newspaper
or other publication, or any advertising device, or by public outcry or
proclamation, or in any other manner or means whatever, including over the
Internet, any statement, concerning that . . . personal property or those services . .
. which is ***untrue or misleading***, and which is known, or which by the exercise of
reasonable care should be known, to be untrue or misleading . . .

(emphasis added).

130.    The FAL further provides:

no price shall be advertised as a former price of any advertised thing, unless the
alleged former price was the prevailing market price … within three months next
immediately preceding the publication of the advertisement or unless the date when
the alleged former price did prevail is clearly, exactly, and conspicuously stated in
the advertisement.

Cal Bus. & Prof. Code § 17501.

131.    Defendant's routine of advertising discounted prices from false ticket prices, which

are not and never have been the prevailing market prices of those products and were materially

greater than the true prevailing prices (i.e., Defendant's average and/or most common actual sale price), constitutes an unfair, untrue, and misleading practice in violation of the FAL. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold by Defendant are worth more than they actually are.

132.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff Sikavi and members of the California Class suffered economic injury.

133.    Plaintiff Sikavi, on behalf of himself and the California Class, requests that this Court order Defendant to restore this money to Plaintiff Sikavi and the California Class, and to enjoin Defendant from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff Sikavi, members of the California Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

## **FIFTH CAUSE OF ACTION**

### **Violation of California's Consumers Legal Remedies Act ("CLRA")**
### CAL. CIV. CODE § 1750, *et seq.*
### *(On Behalf of Plaintiff Sikavi and the California Class)*

134.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

135.    Plaintiff Sikavi brings this claim individually and on behalf of the members of the California Class against Defendant for violations of the CLRA, Cal. Civ. Code § 1750, *et seq.*

136.    Plaintiff Sikavi and each member of the California Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendant's sale of products were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiff Sikavi and members of

the California Class are "goods" or "services" within the meaning of Cal. Civ. Code § 1761(a)-(b).

137.    Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff Sikavi and the California Class which were intended to result in, and did result in, the sale of products sold at Defendant's Brooks Brothers Factory stores:

a)    advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

b)    making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

138.    Plaintiff Sikavi and the California Class are consumers who have suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendant's use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff Sikavi therefore seeks an order enjoining such methods, acts, or practices as well as any other relief the Court deems proper. Plaintiff Sikavi additionally seek costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

139.    On November 18, 2024, Plaintiff Sikavi, through counsel, sent a CLRA demand letter by certified mail to Defendant that provided notice of Defendant's violation of the CLRA as alleged herein, and demanded that Defendant notify all members of the California Class and correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, Plaintiff Sikavi would file a complaint seeking damages in accordance with the CLRA. If Defendant does not respond to Plaintiff Sikavi's letter and agree to rectify the problems associated with the actions

detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782, Plaintiffs will amend this Complaint to seek actual, punitive, and statutory damages, as appropriate against Defendant.

140.    Filed concurrently is a declaration of venue pursuant to Cal. Civ. Code §1780(d).

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and on behalf of the other members of the Classes, requests that this Court award relief against Defendant as follows:

A.    an order certifying the Classes and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

B.    awarding actual, punitive and statutory damages as permitted under the New York False Advertising Act and the New York Consumer Protection from Deceptive Acts and Practices Act;

C.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

D.    awarding declaratory and injunctive relief as permitted by law or equity, including an order enjoining Defendant from continuing the unlawful practices as set forth herein and retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

E.    ordering Defendant to engage in a corrective advertising campaign;

F.    awarding attorneys' fees and costs; and

G.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: November 18, 2024

**LYNCH CARPENTER LLP**

By:  */s/ Gary F. Lynch*

Gary F. Lynch (NY 5553854)
gary@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:    412.322.9243

**LYNCH CARPENTER LLP**
Todd D. Carpenter (*pro hac vice* forthcoming)
todd@lcllp.com
Scott G. Braden (*pro hac vice* forthcoming)
scott@lcllp.com
James B. Drimmer (*pro hac vice* forthcoming)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:    619.762.1910
Facsimile:    858.313.1850

*Attorneys for Plaintiffs and*
*Proposed Class Counsel*