UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KENNETH GUERRIERO, ELLEN
FEINSTEIN, and ALLEN CINO on behalf of
themselves and all others similarly situated,

                        Plaintiffs,                        24-cv-8778 (PKC)

            -against-                     OPINION AND ORDER

BB OPCO, LLC, a Delaware limited liability
company, and DOES 1-50, inclusive,

                        Defendants.
------------------------------------------------------------x

CASTEL, Senior District Judge

        Defendant BB OpCo, LLC ("Brooks Brothers") owns and operates Brooks Brothers Factory outlet stores across the country. (Compl't ¶ 93.) Plaintiffs allege Brooks Brothers caused them to overpay for items they purchased at these stores by creating a deceptive pricing scheme that, by advertising fictitious markdowns on outlet items, artificially fueled consumer demand. Plaintiffs now seek money damages and equitable relief under New York and California consumer protection statutes, as well as under several common law claims. Brooks Brothers has moved to dismiss all claims for failure to state a claim. For reasons that will be explained, Brooks Brothers' motion will be granted to a limited extent and otherwise denied. No discovery has been conducted, and the evidence underlying the claims may present a different picture on a complete factual record.

BACKGROUND

The following facts are drawn from the Second Amended Complaint (the "Complaint" or "Compl't") and are taken as true for the purpose of resolving the instant motion. See Faber v. Metropolitan Life Insurance Co., 648 F.3d 98, 104 (2d Cir. 2011).

This putative class action is not unlike the many other "outlet store" cases brought in federal courts. See, e.g., Belcastro v. Burberry Ltd., 16-cv-1080, 2017 WL 744596 (S.D.N.Y. Feb. 23, 2017) (Caproni, J.) ("Burberry I"); Belcastro v. Burberry Ltd., 16-cv-1080, 2017 WL 5991782 (S.D.N.Y. Dec. 1, 2017) ("Burberry II"); Binder v. Michael Kors (USA), Inc., 23-cv-3941, 2024 WL 3227943 (S.D.N.Y. June 28, 2024) (Ho, J.). It alleges that Brooks Brothers "publish[ed] fake discounts off of inflated and fictitious 'original' prices to drive up demand" in Brooks Brothers Factory outlet stores. (Compl't ¶ 1.) Each of the three named plaintiffs made a purchase at a Brooks Brothers outlet store in stated reliance on Brooks Brothers' "false and deceptive advertising, marketing and discount pricing scheme[.]" (Id. ¶¶ 47–48, 55, 63.) Each believed that they were purchasing legitimately discounted items. All contend that they would not have made those purchases or paid as much as they did absent Brooks Brothers' deception.

Plaintiff Kenneth Guerriero purchased a red V-neck cashmere sweater from a Brooks Brothers Factory outlet store in Woodbury Commons in Central Valley, New York on or about November 23, 2023. (Id. ¶¶ 46–47.) The sweater was listed at an "'original' (reference)" price of $79.99. (Id. ¶ 46.) Guerriero purchased the sweater, advertised as 30 percent off, for $55.99.[1] (Id.) Plaintiff Ellen Feinstein purchased a men's activewear top from the same store

---

[1] Plaintiffs note that Brooks Brothers, "through counsel and without any supporting declaration or internal documentation[,]" provided them with an archived webpage "purporting to display a Brooks Brothers product page for a '3-Ply Cashmere V-Neck Sweater' with a listed price of $328." (Compl't ¶ 49.) Plaintiffs assert that the webpage "lacks critical information necessary to establish any concrete connection to Plaintiff Guerriero's specific purchase." (Id.) Nonetheless, plaintiffs propose "limited discovery" to "investigate the circumstances surrounding" the sweater. (Id. at 27 n.40.) That request is denied, as this matter is appropriately addressed during the discovery phase of this action and not in the context of a Rule 12(b)(6) motion.

for $22.49 on or about April 25, 2025.  (Id. ¶ 54.)  The top bore an "original" price of $29.99 but was advertised as subject to a 25 percent discount.  (Id.)  Plaintiff Allen Cino bought a men's sweater vest from the Brooks Brothers Factory outlet in the Camarillo Premium Outlets in California in or around April 2025.[2]  (Id. ¶ 63.)  The price tag "displayed an 'original' reference price of approximately $120, alongside a lower 'sale' price of about $80."  (Id.)

Through counsel, plaintiffs have "investigated" Brooks Brothers' pricing and merchandising practices at its outlet stores.  The "investigation" has consisted of "systematic in-store tracking of merchandise in California from April 18, 2024, through November 13, 2024, as well as similar observations in New York."  (Id. ¶ 38.)  It found that Brooks Brothers tagged merchandise with what plaintiffs describe as "original" prices and placed "placards in the immediate vicinity advertising a percentage off discount from the stated 'original' price" or "a whole-price reduction (e.g., 'Now $XX.XX')[,]" a practice which plaintiffs allege is "materially uniform across all Brooks Brothers Factory outlet locations, regardless of geography or time of observation."  (Id. ¶¶ 19, 39.)  During the investigation, "[h]undreds, if not thousands, of products were observed as continuously 'on sale[.]'"  (Id. ¶ 40.)

Plaintiffs allege that the "majority" of items for sale in Brooks Brothers Factory outlets are "made-for-outlet" ("MFO") and of lesser quality than the items sold in "mainline" Brooks Brothers stores.[3]  (Id. ¶ 23.)  Indicia from plaintiffs' "own investigation and research" that a given product is an MFO item include: "(1) the presence of certain numeric product codes (e.g., '27') on the price tag; (2) tags or labels with simplified formatting, or style numbers not

---

[2] Former plaintiff James English voluntarily dismissed his claims.  (ECF 30.)

[3] "Made-for-outlet" products are those "that are manufactured specifically for sale at outlet stores, rather than being originally sold at, or intended for, a brand's mainline retail stores."  (ECF 29Compl't at 15 n.21.)

traceable to mainline products; [and] (3) use of block-letter logos on price tags rather than the traditional cursive script found on mainline items[.]" (Id. ¶ 24.)

Plaintiffs also engaged a textile expert "to assess whether items sold at Brooks Brothers Factory outlet stores were, in fact, lower-quality products manufactured specifically for outlet sale, rather than genuine surplus or discounted mainline goods." (Id. ¶ 41.) The expert reported, based on an evaluation of three mainline Brooks Brothers items against three "comparable" items from Brooks Brothers Factory outlets, discernable differences in quality. (Id. ¶ 42.) "Each mainline item showed superior quality across multiple measurable dimensions, including materials used, construction methods, finish, labeling, and aesthetic appeal." (Id.)

Plaintiffs also used "sophisticated regression analysis" in order "to predict prices that would have occurred but for misconduct" with the aid of economists and consultants. (Id. ¶¶ 71–72.) The regression, discussed in greater depth below, purports to show "that increasing the reference price by $1 results in an increase of 55¢ in the selling price of items at Brooks Brothers Factory stores." (Id. ¶ 76.)

According to plaintiffs, the merchandising and pricing practices described in the Complaint are "deployed consistently across Defendant's nationwide Factory store network." (Id. ¶ 27.) As a result, "consumers are either purchasing lower-quality, MFO goods that have never been sold at the represented reference price in any market, or they are purchasing non-MFO goods—often older, discontinued, or overstock items—for which the reference prices are outdated, unverified, or no longer reflect any actual or recent sales in Brooks Brothers' mainline retail channels." (Id. ¶ 28.)

The Complaint alleges subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), requiring a class claim in excess of $5 million, exclusive of interest

and costs, and minimal diversity of citizenship.  The Court is satisfied based on the parties'

submissions that there is minimal diversity in this case.  (ECF 45, 46, 47 & 53.)  The Complaint

plausibly alleges an amount in excess of the jurisdictional threshold.

LEGAL STANDARDS

I.       Rule 12(b)(6) Standard

        To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or

conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678.

Instead, the court must examine only the well-pleaded factual allegations, if any, "and then

determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal

under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint,

and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a

matter of law.'"  Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir.

2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).  In reviewing a Rule

12(b)(6) motion, courts assume all factual allegations in the complaint to be true and draw all

reasonable inferences in favor of the non-moving party.  Peretti v. Authentic Brands Group LLC,

33 F.4th 131, 137 (2d Cir. 2022).

        When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "the complaint is

deemed to include any written instrument attached to it as an exhibit or any statements or

documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152

- 5 -

(2d Cir. 2002) (quoting International Audiotext Network, Inc. v. American Telephone and Telegraph Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  Id. at 153 (quoting International Audiotext, 62 F.3d at 72).

## II.    Rule 9(b) Standard

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b), Fed. R. Civ. P.  "To satisfy Rule 9(b), a complaint alleging fraud 'ordinarily' must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  Miller v. United States ex rel. Miller, 110 F.4th 533, 543–44 (2d Cir. 2024) (quoting United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc., 865 F.3d 71, 81 (2d Cir. 2017)).  "Rule 9(b) serves several purposes. '[I]t is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from "improvident charges of wrongdoing," and to protect a defendant against the institution of a strike suit.'"  Id. (quoting O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)).

## DISCUSSION

## I.    Claims Under the New York General Business Law

Guerriero and Feinstein allege violations of New York General Business Law ("GBL") sections 349 and 350 (Counts 1 and 2).  Section 349 of the GBL declares deceptive acts

and practices unlawful, while section 350 proscribes false advertising.  "The standard for recovery under [section] 350, while specific to false advertising, is otherwise identical to Section 349." Denenberg v. Rosen, 71 A.D.3d 187, 194 (1st Dep't 2010) (quoting Goshen v. Mutual Life Insurance Co. of N.Y., 98 N.Y.2d 314, 324 n.1 (2002)).  The elements of a cause of action under both sections are that: "(1) the challenged transaction was 'consumer-oriented'; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3) plaintiff was injured by reason of defendant's deceptive or misleading conduct[.]" Id. (citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 25 (1995)).

Brooks Brothers' motion to dismiss asserts that Guerriero and Feinstein have not plausibly alleged facts showing injury and, hence, have failed to state a claim for relief.  The Court disagrees in part.  Brooks Brothers argues that Guerriero and Feinstein allege mere "subjective disappointment" from not receiving the bargains they expected, which is not a cognizable injury in this context.  See Michael Kors (USA), Inc., 2024 WL 3227943, at *4 (quoting Binder v. Premium Brands Opco LLC, 23-cv-3939, 2024 WL 2978506, at *6 (S.D.N.Y. June 11, 2024) (Buchwald, J.)); see also Burberry II, 2017 WL 5991782, at *4 ("New York law does not recognize an injury based on the subjective value assigned to a missing bargain because it merges deception and injury.").  But Brooks Brothers ignores that Guerriero and Feinstein's theories of injury avoid at least that particular pitfall.

Guerriero and Feinstein first make the case for their "price inflation theory," whereby their injuries were caused by paying more than they would have absent Brooks Brothers' deceptive practices.  (Compl't ¶¶ 69–70; ECF 39 at 17.)  In other words, they allege that Brooks Brothers' "false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices

when compared to what they would have paid had Defendant not engaged in a false reference pricing scheme." (Compl't ¶ 70.)

To state a claim for "injury based on overpayment, a plaintiff must allege that he overpaid by some objective measure, and not just that he felt, subjectively, that he overpaid[.]" Burberry I, 2017 WL 5991782, at *4. Such objective measures might include "the true market value" of Brooks Brothers outlet products, see Premium Brands, 2024 WL 2978506, at *8, or "prices charged for similar products industry-wide[,]" see Rappaport v. Under Armour, Inc., 24-cv-7558, 2025 WL 2624977, at *7 (E.D.N.Y. Sept. 11, 2025). Plaintiffs purport to have developed a regression analysis that can determine the market value of Brooks Brothers outlet products.

The regression model's inputs, gleaned from plaintiffs' "investigation," include the reference and sale prices of 133 Brooks Brothers outlet items, as well as eleven additional variables, such as "product type (e.g., Outwear, Top, Dress, Bottom, Tie, Boxers, Pajamas, and Socks) and target gender demographic (e.g., men's vs women's)." (Compl't ¶¶ 73, 75.) The model used these inputs "to estimate the relationship between Defendant's reference prices and Defendant's selling prices, after accounting for the other factors that influence Defendant's pricing[.]" (Id. ¶ 72.) This analysis yielded a coefficient of 0.55, which suggests "that increasing the reference price by $1 results in an increase of 55¢ in the selling price[.]" (Id. ¶ 76.) In plaintiffs' telling, the coefficient can then be used in a regression equation to "predict selling prices if the reference price was reduced to the typical selling price of the item (i.e., lowering the reference price to remove the impact of the pricing misconduct)." (Id. ¶ 77.)

At least two courts in this District have considered and rejected virtually identical regression analyses in other "outlet store" cases brought by plaintiffs' counsel. This Court joins

them.  In Premium Brands, 2024 WL 2978506, at *8, Judge Buchwald rejected the idea that the analysis could offer "any insight as to the true market value of defendant's products[,]" concluding that "while the analysis may be able to establish an unsurprising correlation between these prices – that as reference prices are increased, so too are sale prices – it clearly cannot establish the type of causal relationship plaintiffs claim it does: that sale prices were increased because of an increase in the reference prices."  Judge Clarke has joined in this reasoning, noting "there remains a large question as to whether any regression model alone can identify some real market value of a falsely discounted product, especially when product value itself can be inherently subjective."  Molayem v. Ralph Lauren Corp., 24-cv-4816, 2025 WL 2773290, at *3 (S.D.N.Y. Sept. 29, 2025),

Plaintiffs' second theory, injury through "product deception," is an improvement. Guerriero and Feinstein allege Brooks Brothers' pricing scheme gave "consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products . . . were worth more than they actually were."  (Compl't ¶ 124.)  Consumers believed they were purchasing premium mainline items but were in fact overpaying for "lower-grade substitutes" that were made-for-outlet.  (Id. ¶ 36.)  Courts in this district have concluded that this kind of injury is cognizable under New York law.  See Irvine v. Kate Spade & Co., 16-cv-7300, 2017 WL 4326538, at *5 (S.D.N.Y. Sept. 28, 2017) (Furman, J.) (citations omitted) ("[B]y alleging that the goods they purchased at the Kate Spade outlets were worth 'less than' than the prices— even the discounted outlet prices—that they paid for them, Plaintiffs allege a plausible, and cognizable, injury."); Burberry II, 2017 WL 5991782, at *4.

Plaintiffs rely upon a textile expert to show that Brooks Brothers outlet products are inferior in quality to mainline products.[4]  (Compl't ¶¶ 41–44.)  The expert "evaluated six garments—three purchased from Brooks Brothers mainline stores and three 'comparable' items purchased from Brooks Brothers Factory outlet stores."  (Id. ¶ 42.)  These items were "V-neck sweaters, polo shirts, and long-sleeve 'Friday' shirts."  (Id.)  "Each mainline item showed superior quality across multiple measurable dimensions, including materials used, construction methods, finish, labeling, and aesthetic appeal."  (Id.)  The mainline version of the V-neck sweater, for example, "was made of Supima cotton" and "had a noticeably softer hand feel, more even stitching, professional cursive labeling, and a quality-focused hang tag describing the garment's construction."  (Id.)  In contrast, the outlet version of the sweater "exhibited uneven stitching, inferior fabric, and no descriptive hangtag[.]"  (Id.)

Brooks Brothers responds that because the textile expert did not evaluate the exact items Guerriero and Feinstein purchased, this analysis "does not say anything about the quality of the items that [they] themselves bought."  (ECF 38 at 14.)  The Court disagrees.  First, the authorities Brooks Brothers cites on this point apply New Jersey law under the Rule 9(b) standard, neither of which is applicable here.[5]  See Robey v. PVH Corp., 495 F. Supp. 3d 311, 323 (S.D.N.Y. 2020) (Koeltl, J.); DiCicco v. PVH Corp., 19-cv-11092, 2020 WL 5237250, at *3–4 (S.D.N.Y. Sept. 2, 2020) (Ramos, J.).

---

[4] Brooks Brothers suggests, for the first time in its reply memorandum, that this use of an expert to frame the allegations in the Complaint was inappropriate.  The Court will not consider this belatedly raised argument.  See Estate of Ungar v. Palestinian Authority, 451 F. Supp. 2d 607, 611 (S.D.N.Y. 2006) (McMahon, J.) ("[A]s a general rule, courts will not consider arguments raised for the first time in a reply brief.").  Of course, Brooks Brothers will, in due course, have the opportunity to challenge the admissibility of the expert's opinion.

[5] Again for the first time in its reply, Brooks Brothers argues Guerriero and Feinstein's claims are precluded by its "disclaimer" that outlet products are different than mainline products.  (ECF 40 at 8.)  Brooks Brothers appears to be referencing the Complaint's statement that mainline product "exclusivity is further confirmed by Defendant's own public admission that its Factory dress shirts follow a different sizing structure than its mainline dress shirts."  (Compl't ¶ 23 & n.23.)  The Court will not consider this argument in resolving this motion.

Second, the Complaint "alleges sufficient facts about a uniform course of conduct to plausibly support a conclusion that the same allegedly [deceptive] practices applied to the items Plaintiff purchased." Michael Kors (USA), Inc., 2024 WL 3227943, at *11 (quoting Dahlin v. Under Armour, Inc., 20-cv-3706, 2020 WL 6647733, at *4 (C.D. Cal. July 31, 2020)). Specifically, plaintiffs plausibly allege that Brooks Brothers outlets are populated with products distinct from those in mainline Brooks Brothers stores, (Compl't ¶¶ 23, 27), that these two product lines differ in quality, (id. ¶ 52), and that Guerriero and Feinstein made their purchases in reliance on Brooks Brothers pricing scheme, (id. ¶¶ 47–48, 55), which led them to believe they had selected premium items when in fact their purchases were lower quality made-for-outlet items.  Feinstein maintains that the activewear top she purchased was made-for-outlet and "was never sold at that reference price through any retail channel."  (Id. ¶ 56.)  Similarly, Guerriero alleges that in purchasing his red cashmere sweater, he "did not receive the benefit of his bargain and, in reality, paid more for the item[] than [it was] worth in the form of a premium as a result of the fake sale scheme."  (Id. ¶ 48.)

Guerriero and Feinstein have accordingly stated claims under sections 349 and 350 of the New York GBL (Counts 1 and 2) and Brooks Brothers' motion to dismiss these claims will be denied, except that the Court will grant the motion to dismiss only insofar as it relies upon the "price inflation" theory.

II.      Claims under the California Consumer Protection Laws

Allen Cino brings claims under California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.) (the "UCL"); California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, et seq.) (the "FAL"); and the California Consumers Legal Remedies Act

(Cal. Civ. Code §§ 1750, et seq.) (the "CLRA") (Counts 3, 4, and 5, respectively).  The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]"  Cal. Bus. & Prof. Code §17200.  Similarly, the FAL bars any 'unfair, deceptive, untrue, or misleading advertising.'"  Williams v. Gerber Products Co., 552 F.3d 934, 938 (9th Cir. 2008).  The CLRA prohibits enumerated "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]"  Cal. Civ. Code § 1770.

"Courts often analyze these statutes together because they share similar attributes."  Quintanilla v. WW International, Inc., 541 F. Supp. 3d 331, 344 (S.D.N.Y. 2021) (Engelmayer, J.) (quoting In re Sony Gaming Networks & Customer Data Security Breach Litigation, 996 F. Supp. 2d 942, 985 (S.D. Cal. 2014)).  "[A]ll three laws require plaintiffs to meet the pleading standards of Federal Rule of Civil Procedure 9(b)."  Id. (collecting cases).  All three laws are also "governed by the 'reasonable consumer' test[,]" which requires plaintiffs to "show that 'members of the public are likely to be deceived'" by the challenged conduct.  Id. (quoting Williams, 552 F.3d at 938).

Brooks Brothers argues that Cino did not show he relied on a false or misleading statement by Brooks Brothers.  It contends, more specifically, that Cino did not adequately allege (a) that he relied on Brooks Brothers' statements rather than inferences he drew from those statements, (b) how and why Brooks Brothers' statements were false or misleading, and (c) that he paid an inflated price.

Brooks Brothers asserts that if Cino was deceived, it was not due to the contents of the price tag on the sweater vest he purchased but rather unwarranted inferences he drew from

the price tag.  This must be so, in Brooks Brothers telling, because the tag only contained a reference price and a sale price, not "explanatory words like 'originally' or 'previously[,]'" (ECF 40 at 13), so Cino's conclusions about the sweater vest's value required "leaps of logic" that "a reasonable consumer would not make[,]" (ECF 38 at 17).  According to Brooks Brothers, this conclusion follows from the reasoning of Dawson v. Better Booch, LLC, 716 F. Supp. 3d 949 (S.D. Cal. 2024).  But the product packaging in Dawson was subject to a different kind of analysis because it involved a front label and a back label.  716 F. Supp. 3d at 957.  The court found the beverage's front label (stating "GOLDEN PEAR" and "pear + tulsi + turmeric + black pepper") to be ambiguous as to the source of beverage's pear flavor, which led it to examine the back label (which read in part "0% JUICE") before concluding as a matter of law that the labeling in its entirety would not deceive a reasonable consumer into believing the beverage contained real pear juice.  Id. at 957–59.

Only "if common sense would not lead anyone to be misled, [may] the claim may be disposed of at a motion to dismiss stage."  Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1018 (9th Cir. 2020).  On these facts, that finding is not warranted.  See Hinojos v. Kohl's Corp., 718 F.3d 1098, 1105–06 (9th Cir. 2013) (explaining that "a product's 'regular' or 'original' price matters" as "it provides important information about the product's worth").  A reasonable consumer could draw the same inferences as Cino based on the sweater vest's tag, "i.e. that the sweater had been offered at the full reference price at that location and was a mainline Brooks Brothers product available for a limited time at a discount[.]"  (See ECF 39 at 22.)

Brooks Brothers' next argument, that Cino did not sufficiently identify how and why its statements were false or misleading to comply with Rule 9(b), also fails.  The sweater vest's price tag showed a reference price of approximately $120 and a sale price of

approximately $80. (Compl't ¶ 63.) Cino maintains he was deceived because the vest "had never been sold at the advertised $120 reference price in any Brooks Brothers mainline retail store or Factory outlet" but he was made to believe the opposite given that "it was sold in a Brooks Brothers store and tagged with a high original price[.]" (Id. ¶¶ 64–65.) These claims are bolstered by the findings of plaintiffs' counsel's "investigation," which concluded that Brooks Brothers Factory outlet prices uniformly "do not reflect legitimate, bona fide former prices." (Id. ¶ 40.)

Brooks Brothers urges that the textile expert's findings and the regression analysis are unpersuasive here. But Cino does not rely on those analyses. Indicators specific to Cino's sweater vest suggest it was made-for-outlet: (1) its "tag simply bore [] 'Brooks Brothers' and 'Made in Vietnam,' without any mention of 'Established 1818' or other distinguishing marks typically found on Brooks Brothers' mainline merchandise" and (2) a sweater vest similar in appearance to Cino's "sold on Brooks Brothers' main website as part of its 'Ultimate Merino Wool' line" but with "distinguishing features such as a cursive 'Brooks Brothers' logo on the interior neck tag and the phrase 'Extra Fine Merino.'" (Id. ¶ 64.)

Other courts have found similar allegations sufficient to satisfy Rule 9(b)'s particularity requirement. The Ninth Circuit in Nunez v. Saks Inc., 771 F. App'x 401 (9th Cir. 2019), for example, held the district court erred in finding the plaintiff had not satisfied Rule 9(b). The plaintiff had "allege[d] he purchased a pair of Saks Fifth Avenue branded shoes at an Off Fifth store in San Diego, California (the Where) on July 15, 2015 (the When)." 771 F. App'x at 403. He had further alleged "that Saks (the Who) used a uniform pricing scheme for its price tags for Saks Fifth Avenue branded clothing (the What) sold exclusively at Off Fifth stores." Id. Those price tags listed "a fictious 'Market Price' alongside a 'You Pay' price at

which the product is sold, but the products are never in fact offered for sale or sold at the 'Market Price' (the How)." Id.

Brooks Brothers' contention that Cino was required to "allege that he investigated the price charged for the specific item he purchased" is also unavailing. (ECF 38 at 14.) Brooks Brothers highlights that the court in Lisner v. Sparc Group LLC, 2:21-cv-5713, 2021 WL 6284158, at *6 (C.D. Cal. Dec. 29, 2021), found an investigation into the pricing practices of Aéropostale that did not examine items purchased by the plaintiffs to be wanting. Plaintiffs' investigation may not have included Cino's sweater vest, but courts applying California law have not uniformly required such pre-suit investigations to satisfy the requirements of Rule 9(b). See, e.g., Jacobs v. La-Z-Boy Inc., 2:24-cv-04446, 2024 WL 5194976, at *4 (C.D. Cal. Nov. 14, 2024) ("Plaintiff was not required to perform or provide specific details of a pre-suit investigation in order to bring a false discount pricing case at all[.]"). And in any event, as explained above, the investigation plaintiffs' counsel did conduct, coupled with Cino's individual allegations, suffice to show at this stage "why" and "how" Brooks Brothers outlet pricing is deceptive.

Brooks Brothers finally argues that Cino fails to show he paid an inflated price. The allegations regarding Cino's purchase, however, do not purport to rely on the "price inflation" theory and regression analysis Guerriero and Feinstein put forward. In sum, Cino has plausibly alleged claims under the California consumer protection statutes (Counts 3, 4, and 5), and Brooks Brothers' motion to dismiss these claims will be denied.

III.    Common Law Claims

Plaintiffs also bring several common law claims under New York law.  Brooks Brothers again attacks the viability of these claims on the grounds that plaintiffs have not plausibly alleged injury.

A.    Unjust Enrichment

Plaintiffs allege Brooks Brothers has been unjustly enriched through revenues generated from the merchandise plaintiffs purchased as a result of Brooks Brothers' deceptive sales practices (Count 6).  Under New York law, "[t]he elements of a cause of action to recover for unjust enrichment are '(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered[.]'"  GFRE, Inc. v. U.S. Bank, N.A., 130 A.D.3d 569, 570 (2d Dep't 2015) (quoting Mobarak v. Mowad, 117 A.D.3d 998, 1001 (2d Dep't 2014)).  Unjust enrichment is not intended to be "a catchall cause of action to be used when others fail."  Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012).  It is "not available where it simply duplicates, or replaces, a conventional contract or tort claim[.]"  Id.

The Court will dismiss plaintiffs' unjust enrichment claim, as it is predicated on the same factual allegations as are the claims under the GBL, namely that Brooks Brothers' "deceptive and misleading pricing practices" in its outlet stores led plaintiffs to pay "more than they otherwise would have had they known the true nature of Brooks Brothers' pricing practices."  (Compl't ¶¶ 169–70.)  "To the extent that these [other] claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects."  Corsello, 18 N.Y.3d. at 791.

- 16 -

Brooks Brothers' motion to dismiss the unjust enrichment claim (Count 6) will be granted.

B. Fraud

Plaintiffs assert common-law claims for fraud by omission and fraud by affirmative representation (Counts 7 and 8).  "To make out a prima facie case of fraud, the complaint must contain allegations of a representation of material fact, falsity, scienter, reliance and injury[.]"  Small v. Lorillard Tobacco Co., 94 N.Y.2d 43, 57 (1999).  Brooks Brothers argues once more that plaintiffs failed to show injury, explaining they must demonstrate "a connection between the misrepresentation and the price that is charged by the defendant or the quality of the good."  (ECF 38 at 21 (quoting Burberry I, 2017 WL 744596, at *6).)  As explained above, however, Guerriero and Feinstein adequately pleaded injury under a theory of "product deception," whereby they overpaid for lesser-quality goods.  Burberry I notes that this is a viable theory of injury in a claim for New York common-law fraud in the very passage Brooks Brothers cites.  See 2017 WL 744596, at *6 (requiring "a connection between" the deceptive practice and "the quality of the good").  Cino, too, adequately alleged injury under much the same theory by plausibly alleging his sweater vest is a made-for-outlet item of lesser quality for which he overpaid in reliance on the reference price.

Brooks Brothers' motion to dismiss the fraud claims (Counts 7 and 8) will therefore be denied.

- 17 -

IV.    The Court Will Not Preemptively Deny Certification of a Nationwide Class

The Complaint alleges three potential classes: a nationwide class, a New York class, and a California class.  (Compl't ¶ 99.)  Plaintiffs have not moved for certification of any class, and the discovery period has not commenced.

Brooks Brothers asks the Court to preemptively deny class certification of the nationwide class to avoid subjecting the parties to "needless delay and expense" because any motion to certify such a class is doomed to fail under Rule 23, Fed. R. Civ. P.  (ECF 40 at 15.) According to Brooks Brothers, a nationwide class cannot be certified because the laws of many states will likely apply to the claims of far-flung absent class members—not just New York and California—and, thus, common questions of law or fact will not predominate under Rule 23(b)(3).  (ECF 38 at 15.)

The Second Circuit has held that "'[a]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3)' to be decided after the motion to dismiss stage."  Williams v. Binance, 96 F.4th 129, 145 (2d Cir. 2024) (quoting Langan v. Johnson & Johnson Consumer Companies, 897 F.3d 88, 93 (2d Cir. 2018)), cert. denied sub nom. Binance v. Anderson, 145 S. Ct. 1048 (2025).  The Court will therefore not strike the allegations of a nationwide class on a motion to dismiss.

V.      Plaintiffs' Requests for Equitable Relief

Plaintiffs' Complaint seeks a variety of relief, some of which is equitable in nature, including restitution, disgorgement, injunctive relief, and corrective advertising.  (ECF 29 at 70.)

Brooks Brothers asks the Court to hold that plaintiffs may not seek equitable relief in this action on the basis that they failed to show that money damages would be an inadequate remedy.  It is true that "before equitable relief will be granted, plaintiffs must show that they have no adequate remedy at law."  Brown v. Sandimo Materials, 250 F.3d 120, 127 (2d Cir. 2001).  A motion to dismiss, however, ordinarily is not the juncture for a Court to decide the possible range of remedies should a claim be proven.  With nothing more than the Complaint and the briefing on the motion to dismiss, it is premature to foreclose the possibility that plaintiffs could prove facts to support some form of equitable relief.  "The axiomatic rule that equitable relief may not be granted when adequate legal relief exists does not affect the viability of either type of claim at the pleading stage."  Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, National Association v. DB Structured Products, Inc., 5 F. Supp. 3d 543, 558 (S.D.N.Y. 2014) (Nathan, J.) (parenthetically quoting The Pantry, Inc. v. Stop–N–Go Foods, Inc., 777 F. Supp. 713, 718 (S.D. Ind. 1991), modified on other grounds on reconsideration, 796 F. Supp. 1164 (S.D. Ind. 1992)).

On a motion to dismiss in which certain claims have been upheld, the Court will not foreclose the possibility that plaintiffs could show an entitlement to equitable relief.

- 19 -

CONCLUSION

Brooks Brothers' motion to dismiss is GRANTED as to the claim for unjust enrichment (Count 6) and the claims under section 349 and section 350 of New York's GBL (Counts 1 and 2), but only insofar as they rely upon on a "price inflation" theory.  In all other respects, the motion is DENIED.

Brooks Brothers' motion to seal portions of its declaration establishing citizenship for jurisdictional purposes is also DENIED.  The declaration is a judicial document entitled to a presumption of public access and there is nothing inherently sensitive or worthy of protection in a party's citizenship.

The Clerk is respectfully directed to terminate the motions at ECF 37 & ECF 51.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:    New York, New York
          March 30, 2026